EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ALBERTO HERNÁNDEZ RIVERA, acusado y apelante.

*Números:* 17311, 17312. *Resueltos:* 25 de mayo de 1962.

*William Fred Santiago, Rafael A. Escudero Bonilla* y *Lolita Miranda de Escudero,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Jorge Zequeira Olivero, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

PER CURIAM: El apelante fue convicto de asesinato en segundo grado y de portar armas. Los hechos ocurrieron en Juncos. La víctima, el día de los sucesos, caminaba con Juana García con quien vivía. Al pasar frente a un grupo de personas, del grupo salió una expresión que se manifiesta así "sui", expresión que la víctima entendió iba dirigida a su acompañante y según esta testigo: "Entonces, el esposo mío miró para atrás y dijo, 'que sui', de que él era una persona cuando andaba con su esposa le gustaba que lo respetaran y que no le gustaban las bromas tampoco". Con motivo de lo dicho por la víctima, el acusado, que estaba dentro del grupo de donde salió la expresión, se adelantó

y le dijo h . . . de p . . . , contestándole la víctima "que más h . . . de p . . . era él". Entonces el acusado cogió una piedra para tirarle a la víctima. Intervinieron para impedir que se agredieran y el acusado "soltó la piedra y se paró en la esquina de un balcón que había allí al lado del poste". Y sigue declarando la testigo "cuando el esposo mío dijo, 'vamos a comer' que pasó el lado de él [el acusado] tenía la mano así detrás, cuando el esposo mío se le arrimó al lado, lo hincó, el esposo mío se puso la mano en el pecho y cayó al suelo". A preguntas de cómo lo hincó contestó "mandándole un cuchillo". La autopsia reveló que el cadáver presentaba "una herida en la línea mamaria anterior, en el sexto espacio inter costal, como dos pulgadas debajo de la tetilla . . ." herida penetrante que "iba a cortar la parte anterior del pulmón izquierdo . . ." "e iba hasta perforar el pericardio, la herida seguía una trayectoria entrando para el vértice del corazón y con esta herida era como de pulgada y media o una y tres cuartos . . ." e "iba a salir a la parte abajo del corazón".

El apelante apunta cinco errores para sostener su recurso.

1. El primero de los errores apuntados se refiere a la forma en que el fiscal impugnó la declaración de un testigo de la defensa. El testigo en cuestión aparecía como testigo de cargo, pero el fiscal no lo utilizó. ■

En *Pueblo* v. *Lebrón*, 61 D.P.R. 657, 672 (1943), resumimos la forma de impugnar la veracidad de un testigo. A ese efecto dijimos:

"El escrito por medio del cual se trata de contradecir al testigo debe mostrársele antes de ser interrogado en relación con el mismo. El propósito para el cual exige la ley que se le muestre su declaración escrita antes de interrogársele sobre su contenido es para que el testigo pueda leerla o pueda serle leída, y una vez enterado de su contenido, deberá preguntársele si lo escribió o firmó, y si lo admite, debe llamársele entonces la atención a las contradicciones o inconsistencias que pudieran existir entre la primera declaración y el testimonio oral, per-

mitiéndole también relatar los hechos o circunstancias que expliquen o reconcilien las manifestaciones inconsistentes o que demuestren la relación de unas y otras entre sí y el significado y propósito de las mismas. Admitida por el testigo la autenticidad de la declaración escrita, se ofrecerá en evidencia, y una vez admitida, debe ser leída al jurado como la mejor evidencia de lo que el escrito contiene. De esa forma puede el jurado determinar por sí mismo si en efecto existe o no la contradicción y dar al testimonio oral el crédito que merezca." ■

Lo ocurrido en el caso de autos cumplió sustancialmente con los requisitos establecidos. A la pág. 83 de la Transcripción de Evidencia la Corte se expresa así:

"Él le ha dado a leer el documento, lo ha leído. La pregunta, si aparece ahí, él tiene que decir, si o no".

El fiscal le pregunta además si él declaró bajo juramento ante él y contesta el testigo en la afirmativa. La explicación que da el testigo es que lo que él ahora declara, [que la víctima había agredido al acusado con un cortaplumas] a pesar de que no aparecía en la declaración jurada, él lo había declarado ante el fiscal. La declaración jurada se presentó en evidencia y aunque no aparece que fue leída ante el jurado, obviamente el jurado pudo considerarla cuando estaba deliberando. ■

Impugna asimismo las instrucciones que dio el juez sobre el asunto de la impugnación del testigo, fundándose en que "[l]a Corte sentenciadora en este momento estaba expresando su opinión ante el jurado, que era el que estaba juzgando la causa y necesariamente al así producirse, el juicio fue perjudicial a los mejores intereses del acusado y de la justicia sustancial que es la que se persigue en todo proceso".

Una lectura de las instrucciones revelará lo frívolo de la contención expuesta. ■

2. El segundo error le imputa al juez que presidió la vista (a) poner en boca del acusado, al resumir la prueba, una frase que él no había dicho; (b) poner en boca de la única testigo de cargo una frase que ella nunca dijo. Y en tercer

lugar también erró el Tribunal al desacreditar al testigo Juan Flores García—al resumirle la prueba al Jurado— ciertas manifestaciones que él nunca dijo en la silla de los testigos. Y en último lugar, erró el Tribunal al resumirle al Jurado y al atribuirle ciertas manifestaciones dichas por la señora Juana Reyes García en su turno como prueba de "refutación" que no fueron dichas por ella en la silla de los testigos.

Consideremos por parte el anterior apuntamiento. El propio apelante afirma que "[p]odría argumentarse que las mismas [refiriéndose a las manifestaciones que impugna] no tuvieron la magnitud ni alcanzaron la dimensión necesarias para por sí solas perjudicar adversamente al acusado". Entonces pasa a expresar que ello sería así si se tomaran aisladamente, pero que lo cierto es que todas en conjunto le son adversas y le perjudican. Veamos si esto es así:

Comienza el apelante indicando que a la pág. 129 de la Transcripción de Evidencia el juez manifestó:

"Pomales Castrillo [la víctima] pasaba con su esposa y que el acusado se le encaretó a Pomales cuando éste le preguntó qué era lo que significaba la palabra 'sui' que había oído y que él había pronunciado poco antes. . ."

El juez claramente no fue preciso en la exposición de lo que aconteció. Pero su versión no altera el hecho fundamental. Era inmaterial quién había pronunciado el vocablo por primera vez. Lo cierto es que cuando el occiso se enfrenta al grupo, el que sale es el acusado. Realmente no tenía importancia precisa quién fue el que pronunció la interjección. La agresión que causó la muerte ocurrió después de este incidente cuando ya todo aparentemente estaba arreglado.

La otra cuestión que impugna se refiere a la manifestación del juez al resumir la declaración de Juana García, "que no hubo nada entre Alberto y su esposo al instante en que Alberto lo hincaba con el cuchillo". Es cierto que estricta-

mente no puede decirse que la testigo manifestó que no hubo nada entre Alberto y su esposo, pero lo cierto es que los hechos tal como ello los relató, demuestran que en ese instante no hubo nada entre el occiso y el acusado, y que al pasar junto a donde estaba parado este último fue que, usando el vocablo que usó la testigo, lo "hincó" con el cuchillo. ■

Se queja el apelante de que al resumir la prueba y al referirse el testimonio del testigo Juan Flores, testigo renunciado por el fiscal y utilizado por la defensa, el juez se expresara así: "El testigo identificó su firma en la declaración que dio ante el Fiscal y declaró que no pusieron en la declaración *eso* de que el difunto le tiró al acusado con la cuchilla pero que él lo dijo. . ." La objeción consiste en el uso del vocablo "eso", que el apelante entiende desacreditaba su caso. No creemos que el uso del vocablo "eso" por el juez en esas circunstancias causará esa impresión en el jurado. Parece que era la forma más sencilla que al juez se le ocurrió para explicarle al jurado la cuestión de la impugnación que hacía el fiscal a la declaración prestada durante el juicio por el testigo. Introdujo un elemento importante sobre el cual no había declarado ante el fiscal: que el occiso tenía un cortaplumas y que lo sacó al dirigirse al acusado. El describir ese hecho con el vocablo "eso" no podía perjudicar al acusado.

El apelante objeta al resumir el juez la prueba de refutación—testimonio de la testigo esposa del occiso para establecer que entre éste y el testigo Juan Flores, presentado por la defensa y que era padrastro de la víctima, no existían buenas relaciones—se expresó al efecto de que la testigo había dicho: "Que algunas veces discutía con el padre cuando lo cierto es que en ningún momento esta testigo dijo tal cosa".

Aparte de que esto beneficiaba al acusado, pues se establecía por la propia prueba del fiscal que el occiso era una persona propensa a discutir, lo cierto es que si se considera-

524

ran conjuntamente, la pregunta y la contestación, en efecto, la testigo manifestó lo que el juez expresó. ■

3–5 El tercer y cuarto error están fundados en que el veredicto es contrario a la prueba y contrario a derecho. Los hechos tal como los hemos expuesto disponen de estos dos errores. El quinto error impugna la instrucción sobre defensa propia. Estas instrucciones siguen la norma establecida en nuestras decisiones. *Pueblo* v. *Túa*, 84 D.P.R. 39 (1962).

*No se cometieron los errores apuntados. Procede confirmar la sentencia dictada el 2 de mayo de 1960 por la Sala de Humacao del Tribunal Superior.*